## Robbins v. Robbins et al.

(Decided Dec. 9, 1932.)

E. C. O'REAR, BENTON & DAVIS, and GEORGE BATTERTON for appellant.

MORRIS & JONES, and D. L. PENDLETON, and JOUETT & METCALF for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

Carl C. Robbins, on and prior to May 10, 1929, owned and operated a printing establishment in Winchester, Ky., from which he, as editor and publisher, issued a newspaper known as the Winchester Sun.   He

had so conducted it that he had established not only a profitable paper, but also a valuable good will. On the afternoon of the day mentioned he dropped dead without having executed a will, leaving as his only heir at law his mother, the appellant and plaintiff below, Kate Robbins, and who at that time, and for many years prior thereto resided on a farm in Bourbon county which belonged to her deceased husband, D. L. Robbins. They had seven children, four boys and three girls, but after Carl's death the children were equally divided as to sex. Some of the children, including a maiden daughter, Mabel Robbins, lived with plaintiff at the time on the Robbins farm in Bourbon county. She managed it with the assistance of the advice of her brother, James Robbins, who lived at Lexington, Ky., and was a prosperous business man.

Mabel Robbins had also creditably filled for a considerable time the position of superintendent of public instruction in Bourbon county. Likewise she had taught school, the last time being in the State of New Jersey, after which she held a position in the government at Washington. While she was serving as superintendent, she did work in the county court clerk's office of Bourbon county. Her brother James Robbins, as we have said, was a successful and prosperous business man, and both of them, as well as the other members of the Robbins family, including plaintiff, were and are considerably above the average in intelligence, and that is especially true with reference to the daughter Mabel and the son James.

Carl Robbins left a widow with no children, and his printing outfit constituted the major part of his personal property, it being valued at about $30,000, if it could be continued as a going concern; but to sell it in the manner as would most likely have to be done by his administrator in winding up his estate it was clear to everyone interested, pecuniarily or otherwise, that it would be greatly sacrificed, and which fact was not only proven in the case, but also known to be true from observation and experience.

The law firm of Jouett & Metcalf, with offices in Winchester, had long been the advisors of Carl Robbins in all legal matters, and, while both of them were his personal friends, Mr. Jouett of that firm was closely

attached to him as a personal friend and frequent associate. He was also acquainted and friendly with James Robbins, as well as the appellee and one of defendants below, Mrs. Pearl Robbins, widow of Carl. Some year or more prior to the death of Carl Robbins he had consulted with Mr. Jouett about incorporating his plant, and had progressed so far as to execute articles of incorporation, but the scheme was never carried out by transferring the property to the corporation or the operation of the plant by it; nor had any stock been issued to any one. In other words, the scheme was at least temporarily suspended.

In March, 1929, circumstances developed requiring Carl Robbins to move his plant out of the building that he had theretofore occupied, and he conceived the idea of buying it from its owner, and he consulted with Mr. Jouett about that proposition. The latter advised him that any amount paid for the building above $25,000 would be excessive, but that the investment of that amount in the building would, perhaps, be justifiable. However, without further consulting Mr. Jouett, and in view of the fact of the cost of moving (to say nothing about the trouble of it), he finally agreed to and did take the property at the price of $27,500, $10,000 of which was paid in cash with a lien on it to secure the balance of $17,500; but the $10,000 paid was borrowed from a Winchester bank, and which in effect was the purchase of the plant entirely on credit. At the death of Carl less than two months thereafter that situation existed.

During the period of the negotiations and consultations about the purchase of the real estate in which the plant was located (the last time being on the very day of Carl's death, and some two hours prior thereto), he revealed to Mr. Jouett, not only his desire to complete the corporation, but also to put into it the purchased real estate in which his business plant was operated and which he had purchased for that purpose for the consideration stated. He, with the assistance of his wife, so far as this record shows, had accumulated every penny of property they possessed. He had not demanded or in any manner obtained his one-seventh interest in his father's farm, but had left it in possession of his mother, who occupied the residence

thereon, and it was used and employed for her benefit and those of her children who resided with her.

On the very evening of Carl's death, James Robbins consulted with Mr. Jouett about the continued operation of the plant and the publication of the paper, and either that day or the next day (Saturday) Mr. Jouett informed him that arrangements had been made for that week's pay roll, and that at least for a temporary period the paper would be issued, except on the following Monday. Carl was buried on Sunday, and on the next day James Robbins again appeared for consultation about the situation and the best thing to be done to preserve the estate, to prevent is sacrifice, and other steps looking to the handling of it in such a manner as would redound to the best interest of those upon whom the law of descent and distribution cast it. Mr. Jouett testified, and we are convinced that it is true, that James Robbins expressed on that or a later occasion, not only a desire to form or complete the corporation and continue the operation of the plant and the publication of the paper, but also to do it in the manner and as intended by his deceased brother.

In his conversations it was also stated by him that he did not believe that any part of the purchase price of the building should be defrayed out of the personal property of Carl Robbins, but that it should be borne by the real estate for the acquisition of which it had been created, and all of which had been very recently done by his deceased brother. On the next day, the 14th of May, he appeared in the office of the attorneys, and stated that whatever he did would be satisfactory to his mother, since he had been advising her all along in her affairs, and, after considerable additional discussion, an agreement was drafted whereby the corporation scheme might be carried out and the stock divided equally between the mother, Kate, and the widow, Pearl Robbins, with an agreed holding of enough shares in others to constitute the corporation with the necessary directors. It was stipulated therein that neither of the obligations for the purchase price should be paid out of the personal estate of Carl Robbins, but that it should be borne by the purchased real estate. But there was no provision in that agreement at that time for the real estate to be put into the corporation whereby either of those amounts would become its debt.

That contract was taken by James Robbins to a meeting at the home of plaintiff on the evening of May 15, at which meeting all of her children were present, as was also the widow, Pearl Robbins. After supper was over, Miss Mabel Robbins proceeded to read the contract. When it came to that clause providing for the erection of a monument to the grave of Carl Robbins, to cost $500, she objected upon the ground, as she stated, that there was already a monument upon the lot. She likewise insisted that the widow, Pearl Robbins, relinquish all of her dowable claim in the undivided interest of Carl Robbins in the Bourbon county farm, and stated that it would be agreeable in exchange therefor for the widow to take and hold the Cadillac automobile owned by her husband without accounting to the mother for any portion of it, although under the proof the automobile was given to the widow by her husband at the time he purchased it. Those alterations were consented to by all of the parties, including the widow, and no other objection was made to that submitted contract by any one at that meeting.

It was agreed that plaintiff would go to Winchester the next day, and that she and the widow would then execute the paper with the agreed to alterations. She and her daughter Mabel did make that trip at that time, but, owing to the inability of Mr. Jouett to be present because of a previous engagement occupying the evening, and because of his professional engagement in the city of Washington within a few days thereafter necessitating the immediate preparation of a brief to be filed in the United States Supreme Court, the matter was deferred until Mr. Jouett could be relieved of such pressing matters and be present when the agreement and others necessary to carry it out were executed.

However, on the 16th of May, in a further consultation with James Robbins and also, perhaps, one with Mabel Robbins, it was suggested by one or both of them that Mrs. Pearl Robbins in the division of the estate ought not to be burdened with the payment out of its personalty of the cost price of the real estate so recently purchased by Carl, and by which he converted its price from personalty into realty. At that time Mr. Jouett under an early opinion of this court (Brewer v. Vanarsdale's Heirs) reported in 6 Dana 204, and

upon what he concluded were the general principles of equity, expressed a doubt whether a court of equity under the circumstances would require the lien portion of the purchase price ($17,500) to be paid out of the personalty of the estate without first exhausting the lien. However, he did not, according to his testimony, assert that proposition as an established one in the law.

Matters ran along, and it was finally agreed that a meeting to complete and execute all agreements would be held at the residence of the widow in Winchester on the night of May 24. But in the meantime Mr. Jouett concluded to alter the original draft of the contract so as to conform to the suggestion for that purpose, and also as consented to at the plaintiff's home on the night of May 15, and to put the real estate into the corporation with the assumption of its lien debt as one of its obligations, and which we think the testimony shows was at the suggestion and with the consent of the two most active children of plaintiff, and subsequently consented to by her; but the bank debt ($10,000) was excluded, although it was included in the original draft.

Miss Mabel Robbins and her mother started from their home to Winchester in the afternoon of May 24 for the purpose of executing the agreement and all others to carry out the plan and purposes therein contained and as might be modified in the manner stated. On the way they stopped in Paris and consulted Mr. J. J. Williams, who was then living and who was a reputable attorney at that place. They had him to prepare a power of attorney for the plaintiff, Kate Robbins, which was in these words: "Know all men by these presents: That I, Mary K. Robbins, (Mrs. D. L. Robbins) of Bourbon County, Kentucky, do constitute and appoint my daughter, Mabel Robbins of Bourbon County, Kentucky, my true and lawful attorney in fact to do for me and in my stead any and all things that may be necessary for her to do to represent me in the settlement of the estate of my deceased son, C. C. Robbins, and to do any and everything for me that I could, in person, do myself; to sign my name by her as agent; to advise with anyone connected with the settlement of said estate and to advise such course in the settlement of said estate, as in the judgment of my daughter, is for my best interest and I hereby give her full power and authority to do any and everything for me, which

I could do myself, in the settlement of said estate and any act done by her to be as binding upon me as though I were present and did same, and my name when signed by her, as agent, to be as binding upon me as though I were present in person and signed same.'' It was then executed by her and duly acknowledged before a notary public and delivered to her attorney thereby created. The two then journeyed to Winchester and entered the office of Jouett & Metcalf. A consultation and rehash of matters was entered into and engaged in at that meeting which lasted for more than half an hour, and Mr. Jouett testified that all of the matters hereinbefore stated with others were discussed at that meeting.

After the evening meal, the parties met promptly at the home of the widow, and all of the children of the mother, including, of course, her son James and her daughter Mabel, were present and participated in its deliberations. In the meantime Mr. Jouett had prepared the necessary papers to carry out that agreement in its altered condition, which included a bill of sale of the Winchester Sun plant to the corporation, and a deed to it for the occupied building from Mrs. Kate and Mrs. Pearl Robbins, with the assumption of only the lien debt by the corporation. Since the articles of incorporation had already been prepared by Carl, preparatory papers for the beginning of functioning thereunder were also prepared by Mr. Jouett, and which included minutes of a stockholders' meeting, election of directors and minutes of their meeting, etc. Promptly after assembling, Mr. Jouett began reading the contract, and announced that if there was any sentence or clause in it that any of the interested parties did not understand for them to speak out and he would explain them. At the appropriate places he interlined with pen and ink the necessary changes in the original draft so as to make it conform to the idea of the corporation taking over the realty and assuming the lien debt on it.

The clause providing for the monument was stricken, and the agreement on the part of the widow to relinquish her dowable interest in the Bourbon county farm was inserted, and other slight necessary interlineations for the carrying out of the modified purpose were made. The deed and other papers were then read, and, after all of the alterations had been made in the presence of the mother and her children and the

modified contract read by Mr. Jouett, James Robbins spoke and said, in substance, that, if any one objected to the execution of any of the papers, or did not understand any of their provisions, now was the time to speak, and no one offered any objection, not even James Robbins, who had been acting for and on behalf of his mother (and which we think the record shows with her acquiescence) nor did Mabel Robbins with the all-sweeping power of attorney in her possession, though present, utter any protest. It was then suggested that the parties sign and execute the papers, and the mother (plaintiff, Mrs. Kate Robbins) suggested to the widow to sign them first, which she did, followed by the signature of plaintiff. Such was the manner in which the bill of sale, the deed, and the contract were all executed. At the same meeting the prepared minutes of the corporation electing officers and directors and allotting shares were also properly signed. After everything had been gone through with, the meeting was adjourned. On the next day Jouett & Metcalf mailed a copy of the contract to Mrs. Kate Robbins, and with it they inclosed her a long letter explaining its contents as well as the law governing the settlement of estates of intestates.

There were several meetings of stockholders for different purposes looking to the future operation of the plant, among which was the employment of a manager, an editor, and other matters connected with such purpose. Within a few days Mrs. Kate Robbins became dissatisfied with the official position that had been given her in the corporation, and at her request three shares of her stock were transferred to her daughter, Mabel, to enable the latter to take her mother's place as a corporation officer, and all of which was done. Miss Mabel Robbins throughout the record seems to have manifested great interest in her brother's estate, and, when she received a copy of the appraisement made by the appraisers, one of whom was her brother, James, she discovered that one gun which she thought her brother owned was not listed, but which was later corrected by finding the gun which had theretofore occupied an obscure place in the residence and was overlooked by the appraisers on that account. Insistence was made by her for the obtention for her mother of certain articles of her brother's household personal ef-

fects, and some friction arose between her and her brother's widow, although up to that time there was apparent harmony, it being testified to by some witnesses that immediately following the death of Carl Robbins the members of his family expressed the desire to favor his widow in the distribution of his estate, but which they deny.

Following the disputations referred to, Mabel Robbins claims to have discovered that under the plan adopted in the contract, and executed through the various collateral papers, her mother had surrendered her interest in the building lately purchased by Carl Robbins, and had obtained therefor only a relinquishment of the dowable interest of Pearl Robbins in the Bourbon county farm and a half interest in the corporation. However, she continued to act as director of the corporation thereafter until the filing of this action by her mother in the following September against defendant Pearl Robbins and the corporation. In the petition she recited the documents that she had executed in the manner stated, and alleged that she was ignorant of their contents and legal effect; that they were not explained to her, and that she did not understand their purpose; that she was misled into executing them, and that the contract so far as she was concerned was without consideration, and she especially objected to clause 5 of the contract which provided for the transfer of the real estate to the corporation and the assumption by it of the lien debt on that property. Her complaints were stated at great length in her petition, and in such terms as that it is susceptible to the construction of seeking cancellation of, not only clause 5 in the contract, but also the deed to the realty and all other portions of the contract whereby the corporation was formed and the settlement scheme adopted. It also is susceptible to the interpretation of seeking a reformation of the contract by eliminating therefrom the provisions whereby the real estate was converted into personalty and divided equally between her and her son's widow. The answers of the two defendants denied all of the material allegations of the petition, and recited in detail the facts we have enumerated, and in another paragraph relied on an estoppel on the part of plaintiff. Appropriate pleadings made the issues, and upon submission, after extensive proof taken, the court dis-

420

missed the petition, from which plaintiff prosecutes this appeal.

It is first argued as a ground for reversing the judgment that there was no consideration for the contract or the deed executed by plaintiff, and for that reason alone they should be cancelled. It is admitted, however, that there was an actual pecuniary consideration of the value of defendant's dowable interests in the D. L. Robbins farm in Bourbon county, and which it is conceded was as much as $1,000; but it is insisted that it was grossly inadequate, since the scheme and plan contracted for resulted in an apparent loss to and surrendering by plaintiff of something like $10,000. We have made no calculation with reference to the latter sum, but for the purposes of this case it may be assumed that it is correct. In the law of contracts, inadequacy of consideration alone is not a ground for rescission or cancellation. However, if, in addition to that fact there are elements of fraud and imposition growing out of mistake, deception, or concealment, then cancellation and rescission may be decreed. But, where the consideration is full and ample, the other elements will not be allowed the weight that would be given to them when the consideration is grossly inadequate. It is a universal principle in the law of contracts that mutual promises form a valid consideration for an agreement; but, in order for that to be so, there must be a benefit to the promisor, or a detriment to the promisee. The propositions stated are so fundamental and so universally applied as to render it wholly unnecessary to incumber the opinion with citations of either cases or text in support of them. It is therefore pertinent at this point to determine whether the facts in this case bring it within the latter mentioned class of valid and adequate considerations.

It is insisted (at least inferentially) that the promisor (plaintiff) not only did not obtain any benefit by the execution of the papers sought to be cancelled, but that she sustained a great detriment, and that, since the promisee, Mrs. Pearl Robbins, did not sustain any detriment, but was benefited thereby, the situation is one excluding the doctrine of mutual promises as a consideration for the contract and the other repudiated papers. But we do not so interpret the facts. They were and are: That Mrs. Kate Robbins

was entitled to half of the surplus of the personalty of her deceased son after the payment of debts and funeral expenses. By far the larger part of that class of property owned by him was his printing establishment with its good will, and which both before and since his death reaped an annual dividend of more than $10,000. To have wound up the estate according to our statutes would have necessitated an enforced sale of that plant, not carrying with it the house that it occupied, followed by a cessation of its earning capacity as a going concern. It evidently was known that purchasers for such property are necessarily limited in number, and the actual value thereof in this case was such an amount as that but few persons could have paid it even for the installation of a new plant. But it was secondhand property, and everyone knows that such class of property sells at public sale for a greatly reduced sum from its actual value. It was therefore patent to every one that for that property to remain and continue to be devoted to the purposes that its deceased owner put it would make it vastly more valuable than if it had to be sold and possibly moved and readjusted at some other place, if the purchaser was one who desired to not engage in business at Winchester but to remove it to another place. These facts were bound to have been known, not only by plaintiff, but equally if not more so by her two experienced and intelligent children, James and Mabel Robbins, the latter of whom exhibited in her testimony a knowledge of the law relating to descent and distribution far in excess of that possessed by the average though equally intelligent layman.

On the occasion of the execution of all the papers (May 24, 1929), as we have seen, Mabel Robbins was her mother's duly constituted agent for all purposes relating to her brother's estate, and, we repeat, she was bound to know it would be vastly more beneficial to the owners of the printing plant (her mother and Mrs. Pearl Robbins) if it could be retained and kept devoted to a continuance of the publication of the paper and the discharge of other functions of a printing plant, and to thereby continue the reaping of the annual income that it had theretofore and has since done. The agreement to any plan that would bring about such beneficial and paying results is, according to our interpretation of the logic of the law and the principles of

equity, such a benefit to the promisor (Mrs. Kate Robbins in this case) as brought the mutual promises of the parties in this case within the doctrine of mutual promises forming a valid consideration.

The foregoing view is sustained, as we conclude, by our opinion in the case of Wallace v. Cook, 190 Ky. 262, 227 S. W. 279, 281, wherein we discussed the consideration of mutual promises necessary to form a consideration for a contract, and in which we defined the expressions "benefit to the promisor" and "detriment to the promisee." Under the principles announced in that opinion, the promisor is benefited sufficiently to sustain the consideration if he "in return for his promise, acquired some legal right to which he would not otherwise have been entitled"; and the promisee sustained detriment when he has "forborne some legal right which he otherwise would have been entitled to exercise." Each of the parties herein was entitled under the law to have the printing plant sold and its proceeds divided between them, since in the very nature of things they could not divide it in kind by mutual agreement. But in either event it would be destroyed as a functioning asset that, according to past experience, was highly earning. The contract nullified the right of either of the parties thereto to insist on the provisions of the law governing the subject, and to preserve that property as an earning asset to both of its owners, and to thereby make it profitable to each of them, as well as to save them the loss that would be entailed by discontinuing the business and selling the property at a vastly reduced price. See, also, the case of Bank of St. Helens v. Mann's Ex'r, 226 Ky. 381, 11 S. W. (2d) 144. In the light of all of the related facts and of the law as we interpret it, we conclude that this argument is not sustainable.

The next and final contention is the alleged deception, mistake, concealment, fraud, and other grounds relied on to obtain the relief sought. The learned judge who rendered the judgment appealed from necessarily found that none such existed. Unless, therefore, under a well-established rule prevailing in this court, such finding by him is against the preponderance of the evidence, or creates more than a doubt in our minds as to its correctness, we would not be authorized to disturb his judgment therefor. But it is insisted that

the evidence as a whole overwhelmingly sustains plaintiff's allegations supporting her equitable right to cancellation. In answering that contention, it might be stated that, perhaps, if the literal words employed by plaintiff and her witnesses. (who were her children) were to be solely looked to, the argument of counsel would be more persuasive. But all tribunals whose task it is to determine facts from testimony have a right to, and they do, take into consideration the circumstances, surroundings, occasional remarks made, actions of the parties, and other factors, all of which write in between the lines of the literally given testimony many facts that are not expressed in the latter. Applying that rule in this case, we are first confronted with the fact that, if we should adopt the argument of counsel, it would result in making his intelligent client and her (to say the least of it) equally intelligent children as her witnesses mere automatons at the conferences held preceding and on the night of May 24, 1929 (at the latter of which the papers sought to be cancelled were executed), and that they upon that and other occasions performed no other function than to occupy chairs, and were as oblivious of what was going on as the pictures on the wall. A sample of the method of testifying is found in plaintiff's testimony in which she testified that on the particular night the parties met and after the business was transacted the meeting was adjourned, and the evidence showed that they were there from 7:30 until 10:30 o'clock, a space of three hours; yet she said that Mr. Jouett read the executed papers so rapidly that she compared it to the speed of a race horse. Evidently she did not refer to one of the Tenbroeck class, else less time would have been consumed.

Miss Mabel Robbins, we repeat, was intelligent, educated, and versed in many matters of law, one of which was the rights of heirs in the property of intestates. In exhibiting such knowledge, she actually engaged in disputes with others less versed; she advocating on every occasion the correct law relative thereto. She was present, not only on the night when the papers were executed, but at some of the prior conferences, and it was no doubt at her behest that her mother executed the power of attorney relinquishing all personal and active participation in the settlement of the estate .

of Carl Robbins, and devolving that duty on her intelligent and educated daughter. James Robbins was an experienced business man, though meagerly versed in the law. He had been representing his mother in practically all of her business affairs. He assumed to do that with reference to the estate of Carl Robbins, and, after full family conferences (and others in which a less number of the family membership participated), his recommendations were carried out in the writings executed. To attribute the obtuseness to plaintiff and her children as is covertly insisted upon and advocated in briefs of counsel would slander them beyond our disposition to approve. We prefer not to so stultify them and to conclude, as did the trial court, that to accomplish the purposes, and for considerations hereinbefore referred to, the papers sought to be cancelled were understandingly executed.

It is considered unnecessary to discuss our opinions, and others referred to in briefs, treating with the various elements entering into the right and remedy of cancellation or rescission of contracts. They are all familiar to the profession, and are eminently useful in the attainment of justice where the facts call for their application. But, as in this case, where a contract has been entered into between parties sui juris with opportunities of understanding the obligations assumed, and also opportunities of receiving advice from those closely related and who themselves possess powers of understanding, and where the contract as so executed possesses beneficial elements in favor of the one seeking its cancellation, plus a property consideration, we think it cannot be successfully claimed that any of the principles announced in the relied on cases are applicable. We will not discuss at length or determine the merits of the pleaded estoppel, since, in view of the conclusions reached, it becomes unnecessary to do so. But we feel it not amiss to say that the record is not entirely barren of grounds supporting it.

Before closing, we feel that we should say that we do not find support in the record for the apologetic criticisms of Mr. Jouett as a witness and as counsel for parties to the litigation, nor for the vigorous, though veiled, aspersions made upon his intention and purposes. On the contrary, we think the record clearly reveals that his only purpose was to assist those who

shared in the property of his deceased friend to so manage and employ it as to reap what he thought was the greatest possible benefit to all concerned, and at the same time to carry out the intentions and purposes of his friend. We find nothing in the record exhibiting any disposition on his part to vary or depart from the course of rectitude and honor either as an individual or professionally.

For the reasons stated, the judgment is affirmed.